908 So.2d 1151 (2005)
USA INDEPENDENCE MOBILEHOME SALES, INC., Appellant,
v.
CITY OF LAKE CITY, an incorporated municipality in the State of Florida; and Columbia County, Florida, a political subdivision of the State of Florida, Appellees.
No. 1D04-471.
District Court of Appeal of Florida, First District.
August 19, 2005.
*1152 Craig B. Willis of Fixel, Maguire & Willis, Tallahassee, for Appellant.
*1153 Marlin M. Feagle of Feagle & Feagle Attorneys, P.A., Lake City, for Appellees.
KAHN, C.J.
Appellant, USA Independence Mobile Home Sales, Inc., appeals from the trial court's Order Denying Plaintiff's Motion for Determination of Taking. We affirm the trial court's determination that no taking occurred on the basis of lost access, as well as its determination that no basis existed to impose liability upon Columbia County under a joint venture theory. We must, however, reverse the trial court's finding that appellant renounced its leasehold interest in the subject property and, therefore, forfeited its right to compensation altogether.

BACKGROUND
Appellant is a closely held corporation controlled by its two principals, Timothy and Angela Graham. In 1997, the Grahams purchased a mobile home sales center in Lake City, Florida, located on the south side of U.S. Highway 90 and across from the intersection of Highway 90 and Douglas Road. Upon purchasing the business, the Grahams entered into a sublease with the previous owner and incorporated the business. When the sublease terminated in 1998, appellant entered into a three-year lease with the owner of the property, Jack Rountree. That lease included an addendum which provided the legal description of the property and further provided:
Lessee to have access to an additional amount of land which is 215' × 366' at the rear of the above described location. Anticipated, but not guaranteed, construction of Douglas Road South of U.S. 90 and along the Western side of the property will reduce the U.S. 90 frontage of 215 feet by an amount required to meet Florida Department of Transportation standards for this type of intersection with traffic signals.
Further it is anticipated that there will be no U.S. 90 access to the property, rather multiple driveways will allow access from Douglas Road along the Western side of the property.
In 1999, the City of Lake City (City) purchased, from Mr. Rountree, a strip of land running along the western side of the property leased to the appellant for the purpose of extending Douglas Road to the south. Appellant did not learn of the transaction until after the sale had occurred.
In April 1999, crews contracted by Columbia County (County) began construction on the Douglas Road extension. As a result of the construction, appellant was required, at its own expense, to move several of its mobile homes to other portions of its lot and to an adjacent lot owned by Mr. Rountree. Once construction began, customers could no longer access appellant's property directly from Highway 90. Customers wishing to visit the sales facility were required to drive through the construction site and access the property through one of three access points created on the Douglas Road extension. Allegedly, access to the site was completely blocked on seven intermittent days between April 1999 and August 1999. During this time, appellant's sales declined from twelve to fifteen homes per month to one to three homes per month.
On October 13, 2000, appellant filed a complaint against the City and County alleging a cause of action for inverse condemnation. Among other things, appellant alleged:
7. Defendants City and County entered into an agreement for the construction of a joint road construction project in Columbia County.

*1154 8. Under the agreement, the City acquired the real property necessary for the project and the County was responsible for the actual construction of the project, which was let pursuant to contract.
Appellant sought damages for the value of the property taken, lost business, and special damages pertaining to personal property and trade fixtures rendered useless by the taking.
Upon appellant's Motion for Determination of Taking, the trial court conducted a bench trial on the issue of whether a taking by the City or County occurred. Denying the motion, the court concluded "that all of the relevant evidence in this case demonstrates that no compensable taking of property from the Plaintiff has occurred as a matter of law." The trial court found persuasive the language in the lease addendum which disclosed the possibility of the Douglas Road construction project. Based on this language, the court concluded that appellant was aware that a portion of the property could be taken and that access from Highway 90 could be eliminated. According to the trial court, this lease language, combined with appellant's actions after the onset of construction, amounted to a renouncement of appellant's leasehold interest in the portion of the property purchased by the City. Moreover, the trial court found that appellant failed to prove that the project impaired access to such an extent as to deny "all economic and beneficial use of the property." Finally, the trial court concluded that the County could not be liable for any taking because it never acquired an interest in the property and appellant failed to prove the existence of a joint venture between the County and the City.

ANALYSIS
Appellant's argument on appeal raises three issues requiring the application of three different standards of review. The issue of whether the trial court erred in finding that appellant renounced its leasehold interest in the property purchased by the City primarily requires a determination of whether the lease language was sufficient to create such a renunciation in the event the construction project came to fruition. A trial court's interpretation of a written agreement is subject to de novo review by this court. See, e.g., 14TH & Heinberg, L.L.C. v. Henricksen & Co., 877 So.2d 34, 37 (Fla. 1st DCA 2004). The trial court's determination that access to the property had not been substantially impaired presents a mixed question wherein the trial court reconciles conflicting evidence and "then decides has a matter of law whether the landowner has incurred a substantial loss of access by reason of the governmental activity." Palm Beach County v. Tessler, 538 So.2d 846, 850 (Fla.1989). Thus, the trial court's factual findings are afforded deference, but its application of the facts to the law is subject to de novo review. See Gainesville Health Care Ctr., Inc. v. Weston, 857 So.2d 278, 283 (Fla. 1st DCA 2003). Finally, the trial court's determination that no basis existed for liability on the part of Columbia County presents a question of fact, which must be upheld if supported by competent, substantial evidence. See generally Knepper v. Genstar Corp., 537 So.2d 619, 622 (Fla. 3d DCA 1988) ("The existence of a joint venture is commonly a fact question to be determined by the trier of fact.").
As to the first issue on appeal, we find that the trial court erred in concluding that appellant renounced its interest in the property purchased by the City. The trial court relied exclusively on this court's opinion in Orange State Oil Co. v. Jacksonville Expressway Auth., 143 So.2d 892 *1155 (Fla. 1st DCA 1962). The primary distinction between this case and Orange State is that the lessee in Orange State abandoned its interest in the leased property before the property had been conveyed by the lessor to the governmental entity. Id. at 893. In affirming the lower court's conclusion that the lessee had committed an anticipatory breach, this court observed:
The general rule appears to be that a partial taking of a leasehold estate under the power of eminent domain does not constitute an eviction of the lessee and he remains bound to perform the obligations assumed by him under the terms and provisions of the lease. Nothing short of a surrender, a release or an eviction will discharge him from his covenants in this behalf. Even though a lessee may be entitled to a reduction in the reserve rental to the extent that a partial taking has diminished the value of his leasehold estate, he is not privileged to unilaterally declare the lease contract terminated, abandon the leasehold estate and refuse to meet the obligations assumed by him in the lease contract.
* * * * * *
It has also been held upon the weight of authority that the breach, abandonment or renunciation of a lease by the lessee before the expiration of the term gives the lessor the right to treat the lease as terminated and resume possession, thereafter using the same exclusively for his own purpose.
Id. at 894 (footnotes omitted). In the present case, appellant did not abandon the property before Mr. Rountree conveyed the property to the City. Instead, appellant continued to occupy the property until construction crews arrived on the site to begin surveying and clearing operations. Moreover, appellant, unlike Orange State, did not provide written notice to Rountree or the City that it intended to vacate the property and terminate its obligations under the lease. See id. at 893. Appellant in this case continued to pay the full amount of its lease payments to Rountree throughout the construction.
The trial court placed undue emphasis on lease language disclosing the possibility that a portion of the property would be lost to the Douglas Road construction project. This disclosure achieved nothing more than placing appellant on notice that construction could occur during the term of the lease. It specifies neither the exact amount of property that would be lost nor the timing of the anticipated construction.
Appellees imply that the lease payments took into account the possibility of construction because appellant did not seek a reduction in rent and Rountree did not offer such a reduction. This argument relies upon an unreasonable interpretation of the addendum language. The language of the addendum is not ambiguous. It simply informs the lessee that construction may occur. The lack of ambiguity precluded the trial court from expanding the meaning of the disclosure by looking to appellant's actions after construction began. Cf. Lab. Corp. of Am. v. McKown, 829 So.2d 311, 313 (Fla. 5th DCA 2002) ("When the terms of a written agreement are ambiguous, parol evidence is admissible to explain or clarify the ambiguous terms.") (citing Strama v. Union Fid. Life Ins. Co., 793 So.2d 1129 (Fla. 1st DCA 2001)). The addendum language did not operate as a waiver of appellant's right to seek compensation in eminent domain proceedings; it simply placed appellant on notice that construction might occur at some indeterminate time in the future.
Appellees do not dispute that a lessee is entitled to compensation if part of its leasehold is condemned. See Winn-Dixie *1156 Stores, Inc. v. Dep't of Transp., 839 So.2d 727, 729 (Fla. 2d DCA 2003). In Winn-Dixie, the Second District observed:
The law in Florida is equally clear that the contract language of a lease cannot extinguish the lessee's right to just compensation for the taking of its leasehold interest unless that language expressly states that the lessee will not share in the eminent domain award in the event of a taking.
Id. Appellees in this case, however, have failed to explain how the lease addendum disclosure constituted an express waiver of appellant's "right to just compensation for the taking of its leasehold interest."
Appellees also suggest that appellant's renouncement of its leasehold interest is evidenced by the fact that appellant was allowed to move its mobile homes to an adjacent lot without charge. This argument ignores the fact that appellant was allowed to use the adjacent lot for storage from the inception of the lease. In addition to the disclosure, the addendum at issue in this case included the legal description of the leased property and a statement providing: "Lessee to have access to an additional amount of land which is 215' × 366' at the rear of the above described location." The addendum does not make the use of the adjacent property contingent upon commencement of the road construction project. Thus, the language in the lease allowing appellant to use the adjacent property at any time, constituted a license for which a portion of the lease payments represented compensation. See Brevard County v. Blasky, 875 So.2d 6, 12 (Fla. 5th DCA 2004) ("A license... is simply a permit to use another's property. It conveys no interest in the land and may not be assigned or conveyed by the licensee."). Contrary to appellees' suggestions, therefore, appellant gained nothing when it moved its mobile homes to the adjacent property. Because appellant always had the right to use the adjacent property, appellant suffered a net loss in available space once construction began.
Consequently, we hold that the trial court erred in determining that appellant renounced its interest in the portion of its leasehold lost to the construction project. Neither the language of the lease nor appellant's actions after construction resulted in an affirmative or express waiver of its right to compensation. On remand, the trial court shall conduct further proceedings to determine the amount of compensation due to appellant.
We leave the remainder of the trial court's findings undisturbed. The trial court correctly denied compensation to appellant on an impairment of access theory. It concluded that suitable access remained after completion of construction and that sporadic loss of access during construction resulted in an inconvenience rather than a compensable taking. In Tessler, the supreme court explained the circumstances under which loss of access without a physical taking may be compensable:
There is a right to be compensated through inverse condemnation when governmental action causes a substantial loss of access to one's property even though there is no physical appropriation of the property itself. It is not necessary that there be a complete loss of access to the property. However, the fact that a portion or even all of one's access to an abutting road is destroyed does not constitute a taking unless, when considered in light of the remaining access to the property, it can be said that the property owner's right of access was substantially diminished. The loss of the most convenient access is not compensable where other suitable access continues to exist. A taking has not occurred when governmental action *1157 causes the flow of traffic on an abutting road to be diminished. The extent of the access which remains after a taking is properly considered in determining the amount of the compensation. In any event, the damages which are recoverable are limited to the reduction in the value of the property which was caused by the loss of access.
538 So.2d at 849. Undoubtedly, the construction project had an adverse impact upon appellant's access. Before commencement, customers turned from Highway 90 directly into the sales center. After completion of the project, customers could only access the property through one of three new access points constructed on the Douglas Road extension. None of the new access points connected Douglas Road with appellant's parking lot. Nevertheless, appellant did not suffer a substantial loss of access warranting compensation. See Fla. Dep't of Transp. v. Kirkland, 772 So.2d 566, 567-68 (Fla. 1st DCA 2000) (holding that mere inconvenience resulting from the redirection of traffic "does not amount to a deprivation of access").
Tessler, and other cases cited by appellant, involved projects which upon completion left no suitable access to the affected property. In Tessler, for example, the court found unsuitable access where the construction of a retention wall left the respondent and its customers with only an "indirect winding route of some 600 yards through a primarily residential neighborhood." 538 So.2d at 847. See also City of N. Miami Beach v. Reed, 749 So.2d 1275, 1275 (Fla. 3d DCA 2000) (affirming a takings determination where curb construction cut off access to landowner's parking spaces); Fla. Dep't of Transp. v. Kreider, 658 So.2d 548, 549-50 (Fla. 4th DCA 1995) (finding a substantial loss of access where construction completely cut off access to a major highway, requiring customers to navigate a 1.4-mile circuitous route to the property). In contrast, access to appellant's property in this case changed from one access point off of Highway 90, to three access points off of Douglas Road. None of the new access points leads directly to what is remaining of appellant's parking lot but, based upon the diagrams submitted by appellant at trial, the nearest access point is only approximately 30 feet from the parking lot. As the Tessler court observed, "[T]he loss of the most convenient access is not compensable where other suitable access continues to exist." 538 So.2d at 849.
Whether access to appellant's property was completely denied at any point during construction relies largely upon factual matters resolved by the trial court in favor of the City and County:
The Court specifically finds that the testimony of Kenneth Sweet, John Colson, and Paul Beauchamp, who were construction superintendents and foremen for the engineering company and construction company, was persuasive in demonstrating that the construction company went to great lengths to maintain access to Plaintiff's property and to reduce the inconvenience to its customers and, in fact, accomplished that goal by eliminating complete blockage to the property to a period of a few hours during the construction project. These individuals were on the job site daily between May 1999 and August 1999 during the construction period.
We acknowledge that Mr. and Mrs. Graham were in an excellent position to observe whether access to the property had been completely blocked. Nevertheless, competent substantial evidence supports the trial court's finding. All three of the witnesses identified in the trial court's order testified they never observed any prolonged denial of access to appellant's property. *1158 Thus, the trial court's finding on this point will not be disturbed.
Finally, appellant argues that the trial court erred in failing to find a joint venture between the County and the City. The existence of a joint venture presents a question of fact. Knepper, 537 So.2d at 623. In Austin v. Duval County Sch. Bd., 657 So.2d 945, 948 (Fla. 1st DCA 1995), this court described the necessary elements for a joint venture:
In addition to the general elements of a contract, for a joint venture, there must be: (1) a community of interest in the performance of a common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits, and (5) a duty to share in any losses which may be sustained. Kislak v. Kreedian, 95 So.2d 510, 515 (Fla.1957). The standard has been construed strictly, so that the absence of even one of the five elements has precluded a finding of joint venture.
Id. In this case, appellant failed to prove the existence of a joint venture between the City and the County.
The County concedes a verbal agreement existed by which the City agreed to purchase the property at issue in this case, and the County agreed to let the contract for construction. The act that resulted in the taking of a portion of appellant's leasehold interest, however, was the purchase of the property by the City. Appellant neither alleged nor proved that the City and the County shared in the cost of purchasing the property at issue. By failing to demonstrate that the County jointly purchased the property, appellant, at the very least, could not satisfy the second and third elements of the test described in Austin. Without taking title to the property, the County did not have a "joint proprietary interest in the subject matter." Austin, 657 So.2d at 948. Without a proprietary interest in the property, the County could not be seen as having "joint control or right of control" over the property. Id. The nature of the agreement admitted to by the County indicates only that the County and the City shared "a community of interest in the performance of a common purpose"  construction of the Douglas Road extension. As to the fourth element of a joint venture, the nature of the undertaking precluded any question of sharing profits. With regard to the fifth element, the losses the County and the City stood to suffer were distinct. The County's loss exposure arose out of its dealings with the construction contractors. The City's risk of loss pertained exclusively to circumstances arising out of the purchase of the property, notably, a potential appellant's inverse condemnation claim.
The cases relied upon by appellant are distinguishable from the present case and do not compel reversal of the trial court's findings on this issue. See Anhoco Corp. v. Dade County, 144 So.2d 793 (Fla.1962); Lost Tree Village Corp. v. City of Vero Beach, 838 So.2d 561 (Fla. 4th DCA 2002). In Anhoco, the court found Dade County could be held jointly and severally liable with the State Road Department for temporary impairment of access caused by the State's road construction. Id. at 796. Three features, however, distinguish Anhoco from the present case. First, Dade County was the entity that initially acquired the land through condemnation proceedings. Id. at 794-95. Thus, unlike Columbia County in the present case, Dade County took title to the property in dispute. Second, the Road Department in Anhoco began construction before Dade County acquired title to the property. Id. at 794. In this case, the County did not begin construction until after the City purchased the property. Third, Dade County *1159 agreed with the Road Department and the Turnpike Authority "to finance the cost of acquisition of the right-of-way and the right of access." Id. at 796. Here, appellant fails to show that Columbia County agreed to finance the costs of acquiring the property for the project.
Lost Tree is also factually distinguishable. That case involved a regulatory takings claim where the combined effects of ordinances enacted by the City of Vero Beach and Town of Indian River Shores rendered the landowner's property valueless. 838 So.2d at 568. The landowner in that case owned islands and submerged lands upon which it sought to develop a residential community. Id. at 565-66. Development had been blocked, however, because the City had an ordinance prohibiting the construction of a new bridgehead and the Town had an ordinance prohibiting residential development without bridge access. Id. at 568. Because the property at issue was located partially within the Town and partially within the City, the landowner could not build a bridge and, therefore, could build no houses. Id. The Lost Tree court rejected the municipalities' argument that "because their respective regulations do not solely deprive Lost Tree from using its property, neither can be liable for payment of compensation." Id. By contrast, the present case has nothing to do with regulatory takings or the combined effects of the County's and City's ordinances. Appellant's loss of its property interest resulted from the City's purchase of property subject to appellant's leasehold interest. Accordingly, we affirm the trial court's determination that no joint venture existed between the County and the City and, therefore, the County is not liable for any compensation due as a result of the City's taking of appellant's property.

CONCLUSION
We REVERSE the trial court's determination that appellant renounced its interest in that portion of its leasehold taken by the City for the Douglas Road construction project. We AFFIRM the remainder of the trial court's order finding that appellant did not suffer a taking through the loss of access and that no basis existed for holding the County liable for the taking of appellant's property. On remand, the trial court will conduct further proceedings consistent with this opinion.
BROWNING and LEWIS, JJ., concur.